Tracey Rae **VANDEVEER**, Plaintiff,

v.

**FORT JAMES CORPORATION,**
Defendant.

No. 00–C–1133.

United States District Court,
E.D. Wisconsin.

March 28, 2002.

Pro Se Plaintiff.

Scott C. Beiqhtol, Amy D. Katarincic, Michael Best & Friedrich, Milwaukee, for Defendant or Respondent.

## ORDER

STADTMUELLER, Chief Judge.

On August 18, 2000, Tracey Vandeveer filed a *pro se* complaint in this court alleging that her former employer the Fort James Corporation ["Fort James"] discriminated against her in violation of the Americans with Disabilities Act ["ADA"], 42 U.S.C. § 12101 *et seq.*, by failing reasonably to accommodate her multiple sclerosis ["MS"]-related workplace limitations. In the months this litigation has been pending the court has been called upon to resolve an unusually large number of motions. Currently before the court are four additional motions: cross-motions to strike proposed findings of fact, and cross-motions for summary judgment. The court will address each in turn.

## MOTIONS TO STRIKE

For six months from August 3, 1998, to February 2, 1999, Ms. Vandeveer worked at Fort James as a customer service representative. Beginning in November 1998, Ms. Vandeveer experienced what she considered to be a stressful working environment. Specifically, one of her supervisors criticized her work on at least two occasions and eventually presented her with a written warning that should her performance fail to improve she would be terminated. She claims that her performance was satisfactory and that stress related to this allegedly unwarranted criticism exacerbated her multiple sclerosis to such a degree that she was forced to take disability leave. In fact, she claims that her physical condition deteriorated to such an extent that she lost her eyesight, thereby becoming largely dependent on her life partner, Peggy Vandeveer, for assistance in day-to-day living.

Before getting into the details of the case, the court must resolve the parties' competing motions to strike from the record certain proposed findings of fact. The court begins by noting that under the local rules of this district, parties are not required to file proposed findings of fact when one of the parties is proceeding *pro se*. *See* Civil L.R. 56.2 (E.D.Wis.). In such a situation, the court, in compliance with Federal Rule of Civil Procedure 56,

decides any motion for summary judgment based on the admissible evidence in the record that has been brought to the court's attention via the parties' briefs. Here, however, the parties *did* elect to file proposed findings of fact. As such, the court will rely upon those when deciding the pending motions for summary judgment, provided, of course, that they are supported by admissible evidence. *See* Civil L.R. 56.2(d); (e)(E.D.Wis.).

 Inadmissible evidence (or proposed findings of fact premised on inadmissible evidence) may be stricken from the record at a party's request. *See Friedel v. City of Madison*, 832 F.2d 965, 971 n. 4 (7th Cir.1987). Evidence that is inadmissible includes affidavit testimony not based on personal knowledge, *see* Fed. R.Civ.P. 56(e), conclusory self-serving statements, *see Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir.2001), hearsay, *see Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir.1997), and irrelevant material, *see* Fed.R.Evid. 402. Proposed findings of fact not supported by independent record evidence are not themselves "evidence" and are not considered by the court. *See* Fed.R.Civ.P. 56(c)(motions for summary judgment are to be decided based on depositions, answers to interrogatories, admissions on file, and affidavits).

The defendant has combed the plaintiff's proposed findings of fact and has alleged that 153 of the 235 offered findings are inadmissible for one or more reasons and should be stricken from the record. The court has reviewed Ms. Vandeveer's proposed findings and agrees that a great many are, indeed, inadmissible. However, while some proposed findings suffer serious flaws such as a lack of support in the cited evidence, the most common flaw in Ms. Vandeveer's submissions is simple irrelevance. Further, in several instances the proposed facts are improperly supported by the evidence cited, but do have

bases in other record evidence. On the whole, the problems with Ms. Vandeveer's submissions are not as extensive as alleged.

Unfortunately, the court does not have the judicial resources to rule individually upon each of the 153 items challenged by Fort James. In the interest of economy, irrelevant items will not be discussed at all. The remaining items will be addressed within the context of court's discussion of the background facts. Where appropriate the court will note that disputes exist regarding these items. As Ms. Vandeveer is a *pro se* litigant, the court will refrain from striking her submissions on technical or easily-corrected grounds. *Cf. Hudson v. McHugh*, 148 F.3d 859, 864 (7th Cir.1998)(courts should give *pro se* pleadings a liberal construction, overlooking technical errors where possible). Where Ms. Vandeveer seeks to rely upon nonexistent or inadmissible evidence, however, the court will not refrain from striking the challenged material. In essence, then, the court will grant in part and deny in part Fort James's motion to strike, as described more fully below.

Ms. Vandeveer also filed a motion to strike material from the record. The brief she filed in support of her motion reads like an additional brief addressing summary judgment, however, and cites no case law in support of her position. As far as the court can tell, Ms. Vandeveer is requesting that four items be stricken: 1) all of Marilyn Peters's testimony regarding Ms. Vandeveer's alleged performance problems, 2) any load candidate reports that might address Ms. Vandeveer's performance, 3) a "CASI" report, and 4) Ms. Peters's final declaration.

The basis of Ms. Vandeveer's objections to Ms. Peters's testimony (whether in deposition or declaration form) is that Ms. Vandeveer believes it to be incorrect. This is not a proper basis for striking

material from the record, however. Inconsistent recollections may create disputed issues of fact ultimately resolvable at trial, but they do not create a situation where one party's recollections may simply be jettisoned in favor of another's. To partake in the redlining suggested by Ms. Vandeveer the court would need to engage in a credibility determination-something the court is forbidden to do at this time. *See Equal Employment Opportunity Comm'n v. United Parcel Serv.*, 94 F.3d 314, 319 (7th Cir.1996).

Ms. Vandeveer's objections to Ms. Peters's testimony suffer a further flaw in that they have been presented *en gross.* While there may (or may not) be evidentiary problems with particular statements made by Ms. Peters, Ms. Vandeveer has chosen to attack the testimony as a whole. The court does not have the resources to scour the record to determine what specific factual assertions may be objectionable and to determine for itself the bases for such objections. As such, the court will not engage in the hunting expedition proposed by Ms. Vandeveer. *See generally Sachs v. Ohio Nat'l Life Ins. Co.*, 2 F.R.D. 348 (N.D.Ill.1942).

Ms. Vandeveer's remaining objections have the advantage of addressing specific evidentiary materials but nonetheless fail to persuade the court. Ms. Vandeveer has asked that the court strike any evidence that relies upon a "load candidate report" to show that Ms. Vandeveer was an underperforming employee, apparently on the grounds that such reports do not present a complete picture. The court hesitates to address this objection because Ms. Vandeveer's competence as an employee is not a dispositive issue in the court's decision today. As it is conceivable that it later would become one if the case were permitted to remain in this court, however, the

court will direct one brief comment to Ms. Vandeveer's objection: The court has examined the material addressed by Ms. Vandeveer and has determined that the defendant has used it only to rebut Ms. Vandeveer's *own* attempted use of load candidate reports. To the extent the reports are admissible on behalf of either party (something the court chooses not address now), they would be admissible (or not) for use by *both* parties. The court will deny without prejudice Ms. Vandeveer's motion as it regards the load candidate reports.

Ms. Vandeveer's objection will be denied as to the CASI report, as well. It appears that the basis of Ms. Vandeveer's objection is that the report has not been "verified." While it is true that many sorts of evidence must be verified ("authenticated") before they may be considered by a finder of fact or a court resolving a summary judgment motion, *see* Fed.R.Evid. 901(a), the material disputed by Ms. Vandeveer has been verified in the most common manner—by sworn testimony that the item is what it is claimed to be, *cf.* Fed.R.Evid. 901(b)(1)(evidence may be authenticated through testimony of a witness with personal knowledge of the item). Ms. Peters has testified that she has personal knowledge that the CASI report is an actual and accurate report kept by Fort James. No more is required. The report is admissible (though will not be relied upon by the court as it is of little relevance). Ms. Vandeveer's motion to strike shall be denied in full. With those considerations addressed, the court will proceed to provide a fuller account of the facts underlying Ms. Vandeveer's lawsuit.

## BACKGROUND

Ms. Vandeveer was preliminarily diagnosed with MS in 1991.[1] At that time Ms. Vandeveer was working as a benefit ana-

---

1. The court has not been provided with Ms. Vandeveer's full medical record or the full

lyst at Humana/Employers Health Insurance. Ms. Vandeveer has not drawn the court's attention to any facts suggesting that the symptoms[2] that resulted in her preliminary diagnosis interfered with her work in any way. On May 21, 1997, however, Ms. Vandeveer did miss work as a result of symptoms consistent with MS. The court's review of Ms. Vandeveer's medical records from the time period (she has not summarized the records in proposed findings of fact,[3] so the court has gleaned what it can from the source materials) indicate that in late May of 1997 she

suffered weakness in her left leg and blurred vision. Her doctor wrote a letter to Humana requesting that Ms. Vandeveer be placed on short term disability leave, and Humana assented.

During her leave Ms. Vandeveer was treated with steroids and as a result her leg weakness resolved itself quickly. Her vision problems persisted until early August of 1997, though. During July, for example, Ms. Vandeveer reported not being able to read, write, or interpret facial expressions.[4] She was able to navigate

transcript of her doctor's deposition. It appears that in 1991 she was given an MRI that produced results "consistent with" multiple sclerosis. It is unclear if she was definitively diagnosed with MS at that time, or ever. The parties appear to agree that Ms. Vandeveer had MS during the time period relevant to this lawsuit, however.

2. Ms. Vandeveer has not informed the court what her initial MS symptoms were, though she states that she has suffered fatigue throughout the past decade.

3. Ms. Vandeveer has proposed a finding of fact that she could not "read, work, drive, etc." during her period of disability leave, citing her medical record and affidavit statements. (*See* Plaintiff's Proposed Finding of Fact ["PPFOF"] 20.) This "summary" of her medical reports is not particularly helpful. Further, the only evidence that Ms. Vandeveer could not work or drive appears only in an affidavit filed *after* the defendant moved for summary judgment. Ms. Vandeveer's medical records, deposition testimony, and earlier-filed affidavits do not mention any of the symptoms experienced by Ms. Vandeveer during her period of disability leave aside from blurred vision. The defendant has requested the court to strike the proposed finding on the grounds of vagueness and lack of evidentiary support, arguing that Ms. Vandeveer's late affidavit is conclusory and self-serving. The court certainly shares the defendant's concerns. The lack of contemporary, or even timely-filed, evidence calls Ms. Vandeveer's assertions into some doubt. Nonetheless, the court will refrain from striking the affidavit testimony. It is based on personal knowledge and does not directly contradict previously-

filed evidence. Further, the inability to work or drive may quite reasonably be inferred from Ms. Vandeveer's documented vision problems, creating at least a potential issue of fact to be considered at the summary judgment stage. *See Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 293 (7th Cir. 1998)(court to draw all reasonable inferences in favor of the non-movant at the summary judgment stage). Nonetheless, the court will strike the "etc." from the proposed finding of fact as being unduly vague.

4. Ms. Vandeveer's medical records do not indicate any other symptoms of her mid–1997 health problems. In her proposed findings of fact, Ms. Vandeveer states that "From May of 1997 through August of 1997, Plaintiff's MS substantially affected her ability to work, care for herself, prepare meals, drive and see." (PPFOF 13.) Fort James has moved to strike the proposed finding on the ground that the affidavit evidence cited either does not support the position offered or is conclusory and self-serving. The court will grant the motion in part. Aside from noting she could not cook or cut her fingernails due to her vision limitations, she provides no explanation for her conclusory statement that she could not care for herself. While cooking and cutting one's fingernails may be elements of caring for oneself, the proposed finding suggests a far greater level of incapacity-a level that is not supported by the record as a whole. For example, Ms. Vandeveer states that her 1997 vision problems were similar to her current ones, and that today she can clean herself, dress herself, walk out to the mailbox to collect the mail, do household chores such as washing dishes, and even do minor chores

her apartment successfully, however, and could see non-detailed items. By mid-August she was fully recovered[5] and cleared to return to work. Ms. Vandeveer believes that her MS episode (which may or may not have contributed to the optic neuritis that impaired her vision) was triggered by a stressful interaction between her and one of her supervisors at Humana.

Sometime during the summer of 1998 the Fort James paper company (then called Fort Howard Paper) advertised an employment opening for a senior customer service representative ["CSR"]. Ms. Vandeveer applied and was interviewed by Lisa Siebold and Joan Seidel. During the interview Ms. Vandeveer did not mention that she had MS.[6] Fort James identified the essential functions of the CSR position as being (1) the ability to interact with external customers and internal employees, (2) close attention to detail to ensure the right product is shipped at the right time and the right manner to the right location, (3) the ability to interact in a positive way with customers even in stressful situations, (4) strong communication and interpersonal skills, and (5) the ability to either meet or manage customer expectations.[7] Ms. Vandeveer represented

outside the house, such as assisting with the grocery shopping. These are the activities that one would normally consider "caring for oneself." Thus, the court will disregard the assertion that Ms. Vandeveer could not care for herself. *Cf. Albiero* 246 F.3d at 933 (conclusory, self-serving statements do not create issues of fact in summary judgment motions). As with the evidence supporting the proposed finding described in footnote 3, however, the court will permit the other aspects of Ms. Vandeveer's proposed finding to stand, at least to the extent that they may create a triable issue of fact.

5. Ms. Vandeveer's doctor stated that the plaintiff had "classic relapsing remitting disease with complete resolution of her MS symptoms related to having some leg weakness and some vision disturbance." (Aldrich Dep. at 19–22 & Exh. 2, p. 6.)

6. Nor does Ms. Vandeveer draw the court's attention to any evidence suggesting she told the interviewers (or anyone else at Fort James) that she had taken a period of disability leave while employed at Humana/Employer's Health Insurance.

7. These five job requirements have been forwarded by Fort James during the course of this litigation and may not have been the specific job requirements discussed by Ms. Siebold and Ms. Seidel. An unauthenticated job description allegedly prepared by Marilyn Peters on October 10, 1997 and offered by Ms. Vandeveer lists (in a somewhat grammatically challenged way) the "primary responsibilities and duties" of the CSR position as being:

-Accountable for supplying customer service to customers and sales reps in a specific territory totaling approximately $30 million of Fort James commercial business. Provide follow-through on all actions necessary to satisfy our customers.
-Servicing customers include the following: Deduction resolution, sales transfers, new account setup and procedures, order entry/fax/phone/edi, building loads, scheduling appointments, provide product information, samples, show orders, dispenser leases/programs, service level monitoring, review/decide freight costs for out of territory, inventory availability, coordinate Foodservice shipments, credits/debits, resolve invoice problems, knockdown cartons, dispenser keys/parts, customer exceptions, pick-up agreement lumper requests, PODS, late ship review and coding, shipment status, transportation traces/call carrier, order refusals
-Provide into-stock pricing to customers
-Product integration/introduction/discontinuation
-Aid in training of Associate CSR's
-Implement/communicate/measurement of promotions
-Develop, maintain and improve interdepartmental relations
-Co-worker evaluations
-Participate in rollout of departmental charges

It is clear that this job description is not inconsistent with the essential job functions presently forwarded by Fort James.

that she had developed these skills during her latter years at Humana, where she had been promoted from benefit analyst to customer service specialist (a position allegedly similar to the Fort James CSR position). Ms. Vandeveer was hired and began work on August 3, 1998.

Upon her arrival at Fort James, Ms. Vandeveer was assigned to a seven-member CSR "team," led by Ms. Siebold. There were several other CSR teams at Fort James. Marilyn Peters, Fort James's customer service manager, oversaw all of the teams.

Ms. Vandeveer's first week at Fort James was spent doing orientation activities. Members of Ms. Vandeveer's team showed her how to perform the various aspects of a CSR position. During Ms. Vandeveer's second week she received computer training, particularly on the "SCOOP" software program that Fort James then used to route products to its customers. This training was conducted by a senior CSR. After Ms. Vandeveer's formal training on SCOOP, Ms. Siebold assigned team members Mary Stefl and Tracy Ponkratz to answer any questions Ms. Vandeveer might develop concerning SCOOP. Ms. Vandeveer believes she received adequate training on the SCOOP software and has commented that everyone was extremely helpful to her during training.

Despite the training Ms. Vandeveer received, Ms. Siebold contends that in late August she began receiving complaints from Ms. Vandeveer's teammates regarding Ms. Vandeveer's performance.[8] She states that she largely ignored the alleged problems, however, because Ms. Vandeveer was new to the job and was entitled to "the benefit of the doubt." Ms. Vandeveer's mistakes allegedly persisted, though, and in early November Ms. Siebold sat down with Ms. Vandeveer to discuss the situation. Ms. Siebold and Ms. Vandeveer have somewhat conflicting memories of the meeting. According to Ms. Vandeveer, Ms. Siebold simply pointed out two errors Ms. Vandeveer had made entering stock numbers and suggested that she could cut down on such errors by looking at previous merchandise orders by the same customers. Ms. Siebold recalls discussing an "inordinate number of mistakes, particularly those due to using incorrect stock numbers." Both parties agree that Ms. Siebold asked if Ms. Vandeveer was feeling overwhelmed by her amount of work. Ms. Vandeveer said no and that she would try to be more careful in the future.

Later that month Ms. Siebold allegedly received a complaint from one of Fort James's customers regarding the delivery date of some product Ms. Vandeveer had handled.[9] Ms. Siebold met with Ms. Vandeveer, allegedly to discuss the situation. Ms. Vandeveer admits that the

---

**8.** Ms. Vandeveer notes in her responses to the defendant's proposed findings of fact that no contemporaneous record of these complaints has been presented into evidence. Therefore, she contends, whether the complaints actually occurred is an issue of credibility and one not resolvable on summary judgment. It is not denied that Ms. Siebold claims to have received complaints, however.

**9.** Ms. Vandeveer objects to this allegation on the ground of "hearsay," noting that a contemporaneous record was not kept of the al-

leged complaint. This is not a hearsay situation, however, because no statement has been offered by the defendant and, if it had, it was not offered for the truth of the matter. *Cf.* Fed.R.Evid. 801(c)(" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."). Whether Ms. Siebold did receive a complaint is probably an issue of credibility, however, and will not be resolved in this opinion.

meeting occurred, but denies (on opaque, nonresponsive grounds) the topic of the conversation.

On October 26, 1998, Ms. Vandeveer was not feeling well. Fearing that she might be experiencing a "flare" of her MS, Ms. Vandeveer asked Ms. Siebold if she could take an extended lunch so she could visit her doctor. According to Ms. Vandeveer, "I explained to Siebold that I had MS, explained that sometimes when I have stress-as I did at that time due to the recent death of a family pet-I can experience flares of my symptoms." (Vandeveer Aff. ¶ 28.) Ms. Siebold asserts that Ms. Vandeveer did not at any point inform her of the alleged relationship between stress and Ms. Vandeveer's medical condition. Regardless, Ms. Siebold gave Ms. Vandeveer part of the afternoon off to visit her doctor, where she received prescription steroids. Ms. Vandeveer's condition improved quickly.

Sometime in late October or early November Ms. Vandeveer sent an e-mail to Ms. Peters and to a member of the human resources department named Mary Beth Zeller asking whether Fort James's policy of not extending health benefits to same-sex partners might be changed. Ms. Vandeveer indicated that she is a lesbian and would like to be able to add her life partner to her health insurance. Ms. Vandeveer asserts that Ms. Peters began treating her coolly (or worse) after the late October/early November request for same-sex benefits.

Beginning on December 7, 1998, Ms. Vandeveer's supervisor Lisa Siebold took a period of disability leave due to a back injury. During that time the supervisory functions for Ms. Vandeveer's team fell to Ms. Peters, though her other duties made her a less present supervisor than Ms. Siebold had been.

Around this time Fort James changed software programs, adopting the "COSMOS" system for the company's product delivery coordination needs. Ms. Vandeveer, along with the other CSRs, attended two weeks of classroom training on the system. After Ms. Vandeveer completed her training she was told that she should contact Ms. Stefl or Ms. Ponkratz if she had any further questions. No CSR received more than two weeks of COSMOS training, though some "sat" with other customer service reps for a short period to better acquaint themselves with the system.

Perhaps coincidentally (the plaintiff asserts it is not), beginning on or about December 7, 1998-the date Ms. Peters assumed direct supervisory duties for Ms. Vandeveer-some of Ms. Vandeveer's co-workers began documenting errors Ms. Vandeveer committed at work. On December 14, a day Ms. Vandeveer was absent from the workplace, the entire team met with Ms. Peters to express what they represented to be frustration with Ms. Vandeveer's poor work performance.[10] Written notes were presented to Ms. Peters by team members shortly after the meeting documenting Ms. Vandeveer's alleged deficiencies. The notes purported to document fourteen order or delivery errors committed by Ms. Vandeveer in a one week period.[11] Ms. Peters claims to have received several complaints about Ms. Vandeveer from customers, as well, docu-

---

10. Ms. Vandeveer believes that Ms. Peters organized the meeting herself. Ms. Peters contends that Ms. Vandeveer's co-workers approached her of their own accord to discuss the situation.

11. In her current papers, Ms. Vandeveer has attempted to rebut these allegations, primarily by noting that there was no proof offered that it was *she* who committed the errors. As she does not deny that she committed most of the alleged errors, however, *her response is* largely non-responsive.

menting at least one such complaint with a fax.[12]

On December 18, 1998, Ms. Peters met with Ms. Vandeveer to discuss the situation. According to Ms. Vandeveer, Ms. Peters was "hostile" during the meeting and falsely accused Ms. Vandeveer of being rude to customers. She also asserts that Ms. Vandeveer's unauthorized overtime work was discussed (something Ms. Vandeveer claims was a red herring), as well as Ms. Vandeveer's excessive number of personal telephone calls (which Ms. Vandeveer asserts she promised to correct). Ms. Vandeveer claims that specific "errors" on her accounts were not discussed. Ms. Peters, however, says that specific errors *were* discussed and that Ms. Vandeveer was told that the errors "were serious enough that Fort James' sales representatives and customers had specifically requested that [Ms. Vandeveer] be removed from their accounts."

Ms. Vandeveer's life partner picked Ms. Vandeveer up from work immediately after the meeting and found her crying. Ms. Vandeveer expressed her belief that Ms. Peters was biased against gay people and was determined to drive Ms. Vandeveer from the workplace.[13] Ms. Vandeveer's life partner drove her to the family doctor. Ms. Vandeveer complained of another pos-sible MS flare. The doctor tested her for lupus and diabetes. Shortly thereafter Ms. Vandeveer missed a day of work due to an abdominal wall cramp that may or may not have been related to her possible MS flare.

On December 21, 1998, Ms. Vandeveer sent a letter to Ms. Peters defending her work performance and accusing Ms. Peters of anti-lesbian animus. She did not mention her health in any way and did not request any changes to her working arrangements. The next day Ms. Vandeveer met with a woman named Peggy Lemke in the human resources department. Ms. Vandeveer claims that she told Ms. Lemke that she feared Ms. Peters was trying to fire her solely because she is gay. Ms. Vandeveer also asserts that she told Ms. Lemke that she wasn't feeling well and that her doctors believed her condition to be related to lupus or MS. Ms. Vandeveer reportedly stated that high levels of stress, such as might be caused by the loss of a family member or a pet, had "historically affected [her] MS." (Vandeveer Decl. ¶ 44.) Ms. Vandeveer does not assert that she requested any accommodation for her MS at this time.

Ms. Vandeveer claims that she also talked to Ms. Peters on December 22 to discuss her health.[14] The company's

12. Ms. Vandeveer again notes that no external evidence has been produced proving that the account complained of in the fax was actually her account.

13. The basis of this belief appears to be that Ms. Peters allegedly treated Ms. Vandeveer better before Ms. Vandeveer disclosed her sexual orientation in her request for same-sex health benefits. Ms. Peters is also alleged to have commented at a CSR meeting that "we don't want to hear about people's sex lives," which Ms. Vandeveer interpreted as meaning Ms. Peters disapproved of Ms. Vandeveer's sex life. Ms. Peters denies making such a comment.

14. In Ms. Vandeveer's deposition, she says that she called Ms. Peters "and told her that I didn't have lupus. I said I had-it's just a symptom of my MS is what they had determined. And I told Marilyn about the stress historically making it worse[.]" (Vandeveer Dep. at 51.) When asked by opposing counsel what was said about stress, Ms. Vandeveer responded, "I said I thought we should talk about a way to alleviate my stress because in—she said—no, I'm sorry. She did say, 'Well you picked the wrong job if you don't want stress.' And I said, 'It's not the normal day-to-day stress, it's the stress you're causing me because I feel like you're singling me out and accusing me of things I haven't done.' " (Vandeveer Dep. at 52.) Opposing counsel

"CASI" attendance report shows that Ms. Peters was not at work on that day, however. Ms. Vandeveer states that she considered seeking alternative employment at about this time, but that concerns about health insurance led her to stay.

On January 4, 1999, Ms. Peters received an e-mail message from a sales representative complaining that a delivery for an account believed to be Ms. Vandeveer's was more than a month late. Ms. Peters received a complaint about a separate Vandeveer account the next day. This second account was one of Fort James' largest in the Carolinas, but was being plagued by delivery problems. Ms. Vandeveer claims that she never received the original faxed order on the Carolina account and that subsequent alleged problems on the account cannot conclusively be pinned on her. Regardless of whose fault the problems were, the customer threatened to take his business elsewhere. A further problem emerged on one of Ms. Vandeveer's accounts on January 5. Ms. Peters confronted Ms. Vandeveer about this final error. Ms. Vandeveer admits that she had entered the incorrect delivery mode on the order. In her defense, she notes that she had only recently begun working with the COSMOS system and was not yet fully comfortable with it.

On January 6, 1999, "feeling overwhelmed with stress," Ms. Vandeveer met with a human resources employee named Jill Szamocki. She told Ms. Szamocki that she believed Ms. Peters was setting her up for a "bad employee discharge" due to Ms. Peters's alleged dislike of lesbians and that the stress was making her sick. Ms. Vandeveer told Ms. Szamocki that she had MS and was concerned that the stress she was experiencing might be exacerbating her illness. Ms. Szamocki asked if she should do anything, but Ms. Vandeveer demurred, stating that she would handle her problems herself. Ms. Szamocki wrote the word "disabled" in her contemporaneous notes of the conversation.

On January 8, 1999, Ms. Peters and Mary Weinsnicht, the leader of a different team, met with Ms. Vandeveer to express their concern over the number of errors being attributed to her. It was impressed upon Ms. Vandeveer that her performance was in need of improvement. Ms. Vandeveer asserted that whatever mistakes she had made were minor. Nonetheless, she accepted the supervisors' recommendation that a computer trainer, Darcey Meisner, should review Ms. Vandeveer's order reports to help identify and correct any mistakes made on the COSMOS system.[15]

Ms. Meisner worked side-by-side with Ms. Vandeveer on January 11–12, 1999. Ms. Meisner noted repeated (more than a dozen) errors committed by Ms. Vandeveer and attempted to correct them. Ms. Vandeveer found Ms. Meisner's assistance helpful and would have liked more. She did not request any additional assistance, however; her understanding was that additional training might be available from other members of her "department."

In her notes of the session, Ms. Meisner wrote:

then asked, "Did you suggest any stress relievers on your job or within your job—during that conversation?" Ms. Vandeveer responded, "No. I just said 'We have to find a way to stop the stress that you're causing me.'" (Vandeveer Dep. at 52.) Ms. Vandeveer does not allege that she discussed stress or MS with Ms. Peters on any other occasion. Opposing counsel asked why not. Ms. Vandeveer responded, "Because I thought I had already told her." (Vandeveer Dep. at 54.)

15. Ms. Vandeveer has offered a proposed finding of fact (PPFOF # 169) asserting that she asked Ms. Peters for time off to have an EEG taken. The affidavit she has cited to support this finding says nothing of the sort, however. The proposed finding will not be relied upon by the court.

In general: Pleasant to customers but lacks prompt follow up. Poor retention (even with repeated consecutive reminders). Tracey seemed very passive, wanting to be stepped through each 'PF' key. The basics should be more familiar by now—and even if they are not, the fundamentals of each type of order load have been spelled out in two charts easily posted at one's desk. Can she do the job—yes. Can she do the job without a lot of hand holding—no.

(Emphasis in original). Ms. Vandeveer does not dispute that she committed numerous errors in Ms. Meisner's presence, but contends that they were due to nervousness as a result of having someone watch her work.

Despite Ms. Meisner's assistance, Ms. Vandeveer's problems continued. On January 25, 1999, for example, Ms. Peters was notified that Fort James nearly lost a large account with Universal Studios because of the manner in which Ms. Vandeveer handled the account.[16] Ms. Siebold, who had recently returned from her disability leave, met with Ms. Vandeveer on December 26, 1998, to discuss the continuing problems (or perceived continuing problems). Another meeting occurred between the women on December 28. At that time Ms. Siebold discussed five specific errors Ms. Vandeveer had made during the past week, such as failing to notify a customer that a shipment would be arriving late. Ms. Peters felt that Ms. Siebold's informal discussions were not having their desired effect, however, and decided that a written warning would be required.

On January 29, 1999, Ms. Peters called Ms. Vandeveer into her office and read her a written warning stating, in relevant part:

Yesterday, Jan. 28, 1999, your reports were again reviewed. Unfortunately, many errors were found and several errors were repeated. Lisa discussed these issues in detail with you.

The department cannot continue to tolerate this high error level. As you suggested, Lisa and/or Darcy will be reviewing your Load Candidate Reports twice per week.

The department standard is 99% accuracy. New reps with your level of experience are expected to have a 97% accuracy rate. Your rate is well below this level. Therefore we must see a marked improvement to the 97% or higher accuracy level. In addition all complaints from Customers or Sales Reps. regarding mistakes you made must be significantly reduced. During the next 30 days we will continue to review your performance. Should you fail to show significant improvement further action up to and including termination will be taken.

As always, Lisa and I are available to assist you with any specific concerns you may have.

Ms. Vandeveer responded to this warning with a written "rebuttal" dated February 1, 1999. In it she contends that any alleged "accuracy rate" attained by her or the department is vague and perhaps insubstantiable. This letter did not refer to any stress Ms. Vandeveer might have been

---

**16.** The defendant has supplied the court with print-outs of e-mails related to the problems on the Universal Studios's account. Ms. Vandeveer has challenged the proposed finding of fact that problems existed on the account on the ground that the e-mails are hearsay. If they were offered for the proposition that problems *did* exist on the account, the court would agree. They were offered to show their effect on Ms. Peters, however, and therefore are not hearsay. Nonetheless, they may suffer an independent authentication problem not addressed by Ms. Vandeveer, and as such the court will not rely on them explicitly. The court will accept Ms. Peters's affidavit testimony that she received a complaint regarding Ms. Vandeveer's handling of the account, though.

experiencing and did not request any alteration in her working conditions. It did, however, state that Ms. Vandeveer felt she was not getting enough support from her team members and team leader. At least two other CSRs had performance problems that were documented by Ms. Peters, though both eventually improved and neither was given a formal written warning that termination might be forthcoming.[17]

On February 2, 1999, Ms. Vandeveer submitted to the Fort James human resources department a claim of discrimination on the basis of sexual orientation, asserting that the counselings and warnings she had received were all unjustified and discriminatorily motivated. She alleged that the performance criticisms were part of a scheme to discriminate against her on the basis of her sexual orientation. She did not at any time mention her disability, however, nor accuse Ms. Peters of disability discrimination.

February 2, 1999, ended up being the last day Ms. Vandeveer worked for Fort James. On February 3, 1999–a day Ms. Vandeveer was not scheduled to work-she noticed her vision getting more blurred but she "didn't think much about it, and [she] went to bed that night and woke up in the morning February 4th fully intending to go back to work[.]" (Vandeveer Dep. at 108.) However, on February 4, 1999, Ms. Vandeveer did not feel capable of working because she had suffered a dramatic loss of vision overnight.

Ms. Vandeveer had her vision tested and the results showed her vision to be no better than 20/200. Ms. Vandeveer applied for, and was granted, short-term and long-term disability benefits from Fort James. In March of 1999 Ms. Vandeveer's family physician informed Fort James that there was nothing that Fort James could provide to enable Ms. Vandeveer to return to work. Considering herself totally disabled, Ms. Vandeveer applied for Social Security disability benefits, which were granted retroactive to February 4, 1999.

Ms. Vandeveer believes that prior to February 4, 1999, she was always able to do her job and, in fact, that she did it well. (Se Pl.'s Resp. Br. at 14.) She states, however, that she often felt fatigued when she returned home from work if the day had exceeded her "baseline" stress level. (Vandeveer Aff. 2 ¶ 34.) On those days, "it became impossible for [her] to do anything but sleep after returning home[.]" (Id. ¶ 35.) As a result, Ms. Vandeveer's life partner would sometimes need to do the cooking, housecleaning, and laundry, as well as take care of the couple's daughter. (See id.) It is not alleged that Ms. Vandeveer could not care for herself on the days she felt fatigued. Even on days when Ms. Vandeveer was not unusually fatigued due to stress, she asserts that she could become so after walking for fifteen minutes or engaging in other moderately strenuous physical activities. At that point she would have to terminate her walking or other exertive activities for the day, though she does not allege she would have to take a nap or curtail other non-strenuous activities.[18]

---

17. Ms. Vandeveer allegedly began keeping a notebook of other employees' errors on December 21, 1998. This notebook was left, along with numerous other personal items, on her desk when she began her disability leave on February 4, 1999. In October Ms. Vandeveer asked her life partner to go to Fort James to collect her personal belongings, which had been boxed by the company. The notebook allegedly was not in the box, however.

18. The defendant objected to the alleged facts in this paragraph on the ground that they derive from self-serving affidavits and conflict with notations in Ms. Vandeveer's medical records that "she has been doing her home exercise program" and "she is to continue her walking and swimming program." (Dr. Aldrich notes of 7/17/1998.) The court believes that the affidavits are sufficiently detailed to create an issue of fact, however.

At present and at all relevant times dating back to February 4, 1999, Ms. Vandeveer feels fatigued more often than not, has tingling in her extremities, and has continued difficulty seeing. These are symptoms allegedly consistent with MS. Noting that she experienced symptoms associated with MS more frequently when subjected to stressful situations (such as the disagreement with her supervisor at Humana, the death of her dog, and her December 18 discussion with Ms. Peters), Ms. Vandeveer believes that the cumulative stress of her interactions with Ms. Peters[19] caused her current deteriorated condition.

On April 2, 1999, Ms. Vandeveer filed a charge with the Wisconsin Department of Workforce Development's Equal Rights Division ["ERD"], alleging discrimination on the basis of "sex-female, sexual orientation—lesbian" in violation of the Wisconsin Fair Employment Act, Wis. Stats. § 111.31–39. On September 29, 1999, the ERD issued a no probable cause initial determination on Ms. Vandeveer's claim. On November 16, 1999, Ms. Vandeveer amended the charge to include an allegation of disability discrimination. Fort James moved to dismiss or, in the alternative, remand the charge to the investigation section of the ERD so the new allegation could be investigated. Before the administrative law judge ["ALJ"] could rule on Fort James' motion, however, Ms. Vandeveer sought a voluntary dismissal of her action. This request was granted.

The EEOC issued Ms. Vandeveer a "dismissal and right to sue" letter on July 27, 2000, with the allegation of disability discrimination never having been investigated. It appears that the allegation is contemplated within the right-to-sue letter, though. Acting on the letter, Ms. Vandeveer commenced the present action on August 18, 2000. Her only claim is that Fort James violated the ADA by failing reasonably to accommodate her MS-related workplace limitations.

## DISCUSSION

Both parties in this lawsuit have moved for summary judgment. Ms. Vandeveer's brief in support of her motion conclusorily asserts that the elements of her failure to accommodate claim undisputedly have been met, (see, e.g., Pl.'s Br. in Supp. of Summ J. at 4) (stating that "it is undisputed" that Ms. Vandeveer has a record of disability), invites the court to make credibility determinations adverse to the nonmovant, (see Pl.'s Br. in Supp. of Summ J. at 16—22) (section of brief entitled "Credibility"), and requests that she be permitted to proceed to trial solely for the purpose of ascertaining damages. Her motion evinces a fundamental misunderstanding of summary judgment (a remedy to be granted only when there are no disputed issues of material fact) and may be denied summarily.

The defendant's motion is much more substantive, arguing that Ms. Vandeveer has failed to produce evidence supporting several elements of her prima facie case. This is a proper basis on which to seek summary judgment. See Celotex Corp. v. Catrett, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (entry of summary judgment is appropriate if the movant demonstrates that the nonmoving party has failed to make a sufficient showing on an essential element of its case with respect to which it will bear the burden of proof at trial). After reviewing the admissible evidence it is clear that the defendant is entitled to the relief it seeks.

19. Ms. Vandeveer considers Ms. Peters the primary, perhaps exclusive, source of her allegedly debilitating stress. (See Pl.'s Resp. Br. at 10 "Peters was the cause of this stress because she was the person who made the policy in the department.")

While Ms. Vandeveer has mustered a great deal of indignation and conclusory allegations in her moving papers, she has failed to identify evidence relevant to at least two of the elements of her case, perhaps in the mistaken belief that she could later do so at trial if the court found a trial to be required. Unfortunately for her, summary judgment is the "put up or shut up" moment in a lawsuit. *Schacht v. Wisconsin Dept. of Corrections,* 175 F.3d 497, 504 (7th Cir.1999). The defendant is entitled at this stage of the proceedings to put the plaintiff to her proof; if she does not rise to the challenge summary judgment is required.

The standards employed by federal courts at the summary judgment stage of a lawsuit are well-known to lawyers, but perhaps less understood by *pro se* litigants such as Ms. Vandeveer. For that reason, the court will explain the process in greater depth than is customary: Summary judgment motions are controlled by Federal Rule of Civil Procedure 56. Application of Rule 56 involves "the threshold inquiry of ... whether there is the need for trial—whether, in other words, there are any genuine factual issues that can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law", summary judgment will be granted. Fed.R.Civ.P. 56(c).

To prevail on a motion for summary judgment, the moving party must inform the court of those portions of the record or affidavits that demonstrate the absence of a triable issue. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The moving party may meet its burden by showing "there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548. If the moving party meets this burden, the nonmoving party must then present specific facts showing that there is a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

The non-moving party may not proceed to trial simply by showing the existence of a factual disagreement; only "genuine" issues of "material" fact will defeat an otherwise proper motion for summary judgment. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548. Material facts are facts that, under the governing substantive law, "might affect the outcome of the suit." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. A dispute over a material fact is "genuine" if the evidence is such that a reasonable trier of fact could find in favor of the nonmoving party. *See id.* The court's function at this juncture is not to weigh the evidence or determine the truth of the matter, but merely to determine whether a genuine issue exists for trial. *See id.* at 249–50, 106 S.Ct. 2505.

It has been said that summary judgment is often an inappropriate method for resolving discrimination complaints since intent and credibility are crucial-frequently determinative-issues in such cases, *see, e.g., Giannopoulos v. Brach & Brock Confections, Inc.,* 109 F.3d 406, 410 (7th Cir. 1997); *Adreani v. First Colonial Bankshares Corp.,* 154 F.3d 389, 393 (7th Cir. 1998), and determining credibility is a jury function, not a judicial function, *see Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. Nonetheless, discrimination cases are not governed by a separate set of rules. *See Giannopoulos,* 109 F.3d at 410 (citing *Wallace v. SMC Pneumatics, Inc.,* 103 F.3d

1394, 1396 (7th Cir.1997)). If the non-movant can present no genuine issues as to the material facts, summary judgment must be granted. *See id.* (citing *Holland v. Jefferson Nat'l Life Ins. Co.*, 883 F.2d 1307, 1312–13 (7th Cir.1989)).

■ The law under which Ms. Vandeveer has sued, the Americans with Disabilities Act, makes it illegal to "discriminate against a qualified individual with a disability *because of* the disability of such individual[.]" 42 U.S.C. § 12112(a) (emphasis added). Ms. Vandeveer's case is unique in that she alleges that she has been discriminated against (failure to accommodate a known disability is considered discrimination, *see* 42 U.S.C. § 12112(b)(5)(A)), but has not alleged that the reason for the discrimination was her disabled status. (*See, e.g.,* Vandeveer Dep. at 121–123) ("Q: So at least as of February of 1999, you believe Marilyn was discriminating against you because she didn't like your sexual orientation ... and that was her sole motive, correct? A: Yes"). Noting that "[a]lthough not always stated expressly, to prevail on an ADA failure to accommodate claim, plaintiff must show present evidence that it was the disability and not some other reason that caused the challenged ... action," *Lusk v. Christ Hosp. and Med. Ctr.*, 10 Am. Disabilities Cas. (BNA) 534, 2000 WL 243132, 2000 U.S. Dist. LEXIS 2691 at *24 (N.D.Ill. 2000),[20] the defendant has asked that Ms. Vandeveer's complaint be dismissed summarily. The court need not address this argument because Ms. Vandeveer's suit fails even if evaluated under the established standards for traditional failure to accommodate cases.[21]

■ The ADA requires covered entities, including private employers, to provide "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship." 42 U.S.C. § 12112(b)(5)(A) (1994 ed.). No accommodation is required, however, if the employer is unaware of the individual's workplace limitations, *see Hunt–Golliday v. Metro. Water Reclamation Dist. of Greater Chicago*, 104 F.3d 1004, 1012 (7th Cir.1997), if no request for an accommodation has been made, *see Bultemeyer v. Fort Wayne Cmty. Schs.*, 100 F.3d 1281, 1286 (7th Cir.1996), or if the accommodation requested is not reasonable, *see Weiler v. Household Fin. Corp.*, 101 F.3d 519, 525–26 (7th Cir.1996). Ms. Vandeveer's claim must be dismissed because she has presented insufficient evidence that she is a qualified individual with a disability within the meaning of the ADA or that she requested a reasonable accommodation.

The court begins by noting that the ADA does not serve as "a general protection [for] medically affected persons." *Christian v. St. Anthony Med. Ctr., Inc.*, 117 F.3d 1051, 1053 (7th Cir.1997). To claim the protections of the ADA, a plaintiff must be "qualified individual with a disability" as defined by the Act. *See Moore v. J.B. Hunt Transport, Inc.*, 221 F.3d 944, 950 (7th Cir.2000). The ADA

---

**20.** The court notes that throughout its submissions Fort James has cited unpublished cases. This is specifically prohibited by Circuit Rule 52(b)(2)(iv), and is particularly troubling in a case involving a *pro se* litigant who may only have access to published materials. The court has not read any cases cited by the defendant not published in a major reporter.

**21.** Incidentally, the court is not at all convinced that an employer may fail to accommodate a disabled employee's known work limitations simply because the reason for the failure is anti-gay animus rather than anti-disabled animus. The defendant has cited no cases that might be said to support such a proposition factually.

defines "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). In turn, "disability" is defined as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such impairment; or

(C) being regarded as having such an impairment. See 42 U.S.C. § 12102(2).

To qualify as disabled under subsection (A) of the ADA's definition of disability, a claimant must initially show that she had a physical or mental impairment at the time of the disputed employment action. See 42 U.S.C. § 12102(2)(A). Regulations issued by the Department of Health, Education, and Welfare to define terms in the Rehabilitation Act of 1973, and which have been applied to the ADA, see Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 122 S.Ct. 681, 689, 151 L.Ed.2d 615 (2002), define "physical impairment"-the type of impairment relevant to this case-to mean "any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive, digestive, genito-urinary; hemic and lymphatic; skin; and endocrine." 45 CFR § 84.3(j)(2)(i). MS is such an impairment. See 45 CFR pt. 84, Appendix A, p. 310 (1985).

■ Merely having a recognized impairment does not make one disabled for the purposes of the ADA, however. "Claimants also need to demonstrate that the impairment limits a major life activity." Toyota, 122 S.Ct. at 690 (citing 42 U.S.C.

§ 12102(2)(A)). EEOC regulations interpreting the ADA define the phrase "major life activity" to include key life "functions, such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i)(2002).

Since Ms. Vandeveer's lawsuit focuses on her workplace activities the defendant has presumed that Ms. Vandeveer intends solely to implicate the major life activity of working. (See Def.'s Br. in Supp. of Summ J. at 11–12.) Indeed, a fair reading of Ms. Vandeveer's complaint fails to implicate any other potential major life activity and, as far as the court can tell, no other potential major life activity was examined in Ms. Vandeveer's deposition, at least with respect to the period of time prior to February 4, 1999.

If working is the only major life activity implicated in Ms. Vandeveer's lawsuit, it is clear she was not disabled during her pre-February 4, 1999 employment at Fort James. She herself contends that her impairment did not limit her ability to work at Fort James and that, in fact, she did a very good job. (See Pl.'s Resp. Br. at 10 ("fatigue did not limit my ability to work on a consistent basis"); Vandeveer Aff. 2 ¶¶ 33–36). Even if one were to read the record in a way contrary to that proposed by the plaintiff and to entertain an inference that Ms. Vandeveer was substantially limited in her ability to perform her chosen job (or any other stressful job for that matter), she still would not be disabled within the meaning of the ADA because she has not shown (or even suggested) that she was substantially limited from performing a broad range of other jobs.[22] See Sutton v. United Air Lines, Inc., 527 U.S. 471, 491, 119 S.Ct. 2139, 144 L.Ed.2d 450 ·(1999)("when the major life activity under

---

**22.** Indeed, Ms. Vandeveer contends that she considered seeking alternative employment

once it became clear her interactions with Ms. Peters would be stressful.

consideration is that of working, the statutory phrase 'substantially limits' requires ... that plaintiffs allege that they are unable to work in a broad class of jobs").

■ Ms. Vandeveer seems to realize that she was not substantially limited from working due to her MS while employed at Fort James.[23] Instead, she argues in her brief in response to the defendant's motion for summary judgment that her MS substantially limited her ability to perform other physical activities, such as manual tasks and walking, and that she should be considered disabled as a result. The primary problem with this argument is that it was raised far too late. It was nowhere suggested in her complaint and-presumably for that reason-discovery on it was never taken. Indeed, Ms. Vandeveer sprung the argument on Fort James only after the opportunity to develop a defense to it had passed. "Although a complaint need not correctly plead every legal theory supporting the claim ... at the very least, [the] plaintiff must set forth facts that will allow each party to tailor its discovery to prepare an appropriate defense. Because a failure to assert a claim until the last minute will inevitably prejudice the defendant, courts ... have consistently ruled that it is inappropriate to raise new claims for the first time in opposition to summary judgment." *Beckman v. United States Postal Serv.*, 79 F.Supp.2d 394, 408 (S.D.N.Y.2000). *See also Andree v. Ashland County*, 818 F.2d 1306, 1314 n. 11 (7th Cir.1987). As such, Ms. Vandeveer is barred from arguing that while her impairment may not have substantially limited her ability to work it limited other major

life activities and, therefore, she was a qualified person with a disability at the time she worked for Fort James.

Even if Ms. Vandeveer were permitted to proceed with her new theory of disability, however, it would provide her little hope of success. As explained above, for a plaintiff to be eligible for the protections of the ADA under 42 U.S.C. § 12102(2)(A), she must have been "substantially limited" in the ability to perform a "major life activity" at the time of the alleged failure to accommodate. As the United States Supreme Court recently explained, these phrases must be interpreted strictly since the ADA established a demanding standard of coverage. *See Toyota*, 122 S.Ct. at 691.

It is doubtful the household chores Ms. Vandeveer has stated she sometimes could not perform would fall into the category of "major life activities." Further, as she has not informed the court how often her fatigue prevented her from performing them, or whether she was completely prevented from doing them or simply deterred, there is insufficient evidence from which a reasonable jury could conclude that Ms. Vandeveer was "substantially limited" from performing the chores. As such, the court likely would not permit Ms. Vandeveer to bring her "manual activity" theory of substantial limitation to a jury. *Accord Cooper v. Olin Corp.*, 246 F.3d 1083, 1088–89 (8th Cir.2001)(individual who suffers fatigue but can work and care for herself not disabled within the meaning of the ADA because "difficulties in life that do not hinder performance of required

---

**23.** While Ms. Vandeveer did apparently become substantially impaired in one or more major life activities on February 4, 1999, she herself contends that she was unable to perform the essential functions of her position as of that point. (*See* Pl.'s Br. in Opp'n to Summ J. at 8.) Therefore, Ms. Vandeveer was no longer a "qualified" individual with a dis-

ability in the post-February 4, 1999, era because there was no longer anything Fort James could do to accommodate her. *See Weiler v. Household Fin. Corp.*, 101 F.3d 519, 525 (7th Cir.1996). The only time period relevant to the court's analysis is the period between August 3, 1998 and February 2, 1999.

tasks not substantial limitation")(quoting *Cody v. CIGNA Healthcare of St. Louis, Inc.*, 139 F.3d 595, 598 (8th Cir.1998)). Nor is it likely the court would permit a jury to hear of Ms. Vandeveer's alleged difficulties walking for more than fifteen minutes since, although walking is a major life activity, people are not often called on to walk for lengthy periods of time and the inability to do so for more than fifteen minutes is not likely a "substantial limitation." *Accord Penny v. United Parcel Serv.*, 128 F.3d 408, 411 (6th Cir.1997)(collecting cases rejecting claims that moderate walking impairments "substantially limit" the major life activity of walking); *Kelly v. Drexel Univ.*, 94 F.3d 102, 107–108 (3rd Cir.1996)(same).

Having rejected Ms. Vandeveer's claim that she is a qualified individual with a disability due to an actual disability suffered during the period of employment, the court must evaluate whether she nonetheless falls within the protections of the ADA as a consequence of having a record of disability or being regarded by her employer as being disabled. *See* 42 U.S.C. § 12102(2)(defining disability). Ms. Vandeveer dedicates a surprisingly small amount of argument to either possibility. (*See* Pl.'s Br. in Opp'n to Summ J. at 11) (dedicating one paragraph to each point of contention).

■ In support of her position that she should be regarded as having a "record of" impairment, Ms. Vandeveer simply notes that she took a period of disability leave from Humana in 1997 due to symptoms consistent with MS and contends that her medical record from that period satisfies the "record of" impairment standard. (*See id.*) Ms. Vandeveer misunderstands the import of the statute. The ADA is not intended to protect people who may have hospital records, *see Sorensen v. Univ. of Utah Hosp.*, 194 F.3d 1084 (10th Cir. 1999)(nurse who was hospitalized due to symptoms consistent with MS did not have a record of disability),[24] but rather to protect individuals who "are subjected to discrimination because of their history of a substantially limiting impairment," *EEOC Compliance Manual*, § 902.7, ¶ 6887. Thus, to proceed under 42 U.S.C. § 12102(2)(B)(record of impairment), a plaintiff must show both that she suffered a substantial impairment of a major life activity in the past and that the employer relied on the record of that impairment when making a decision that affected the plaintiff's employment. *See* 29 C.F.R. § 1630, App. § 1630.2(k) (2002). *See also Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 510, n. 7 & n. 8 (7th Cir.1998). Ms. Vandeveer has not attempted to make either of these showings. Even had Ms. Vandeveer attempted to meet the required showings, she has not mustered enough evidence to support either.

■ The Equal Employment Opportunity Commission has established the following factors to be considered when determining whether an individual was "substantially limited" in a major life activity (thus satisfying the first element of a "record of impairment"): "(i) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permanent or long

---

24. In *School Board of Nassau County v. Arline*, 480 U.S. 273, 281, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987), the United States Supreme Court commented that a period of hospitalization for tuberculosis was "more than sufficient" to establish a record of impairment. As many courts have noted, however, this dicta is of limited use in evaluating ADA claims because the issue was not contested before the Court, *see id.*, and because the Court did not provide any details concerning either the length of Ms. Arline's hospitalization or the severity of her affliction, *see Byrne v. Bd. of Educ.*, 979 F.2d 560, 566 (7th Cir.1992)(quoting *Taylor v. U.S. Postal Serv.*, 946 F.2d 1214, 1217 (6th Cir.1991)).

term impact of or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2)(2002). While she has not fully explained the situation, Ms. Vandeveer alleges that during her period of leave from Humana she was unusually fatigued, had temporary weakness in her left leg, and had a temporarily persisting inability to see detailed objects. She further claims that these impairments interfered with her ability to cook, cut her toenails, and drive.

Importantly, Ms. Vandeveer's period of alleged disability lasted less than three months, at which time her doctor stated that she had achieved "complete resolution" of her symptoms. Thus, it appears that Ms. Vandeveer's short-term leave was considered by her and her doctor to be a one-time event without lingering effects. As suggested y the final two factors in 29 C.F.R. § 1630 .2(j)(2002) temporally discrete impairments of this sort generally do not satisfy the standards of the ADA. *Cf.* 29 C.F.R. § 1630, App. § 1630.2(j)(2002)(broken leg that takes eight weeks to heal does not create a record of impairment for the purposes of the ADA). *See also EEOC Compliance Manual,* § 902.7 ¶ 6887, Example 2.[25] *Accord Sorensen,* 194 F.3d at 1087 ("Because Plaintiff's hospitalization and MS symptoms affected her for only a brief period of time and do not presently impact her ability to perform her job, Plaintiff did not suffer an impairment that substantially limits a major life activity."). Thus, while presenting a closer question than those in the standard examples, Ms. Vandeveer has produced insufficient evidence to support the first element of a record of impairment.

Ms. Vandeveer also has failed to present evidence on the second element of a valid 42 U.S.C. § 12102(2)(B) claim in that she has not shown Fort James relied on her alleged record of impairment in any way. She has not even claimed that Fort James knew she took a period of disability leave from Humana. Her alleged statements to Ms. Siebold and Ms. Peters that stress "historically" had exacerbated her MS are too conclusory to permit an inference that she told the women she had once taken several weeks off work because she had what she considered to be a debilitating vision problem. As summary judgment is the time at which a litigant must present her evidence, the court cannot give Ms. Vandeveer a further opportunity to fill out her story to satisfy the elements of her claim. *See Jones v. Johnson,* 26 F.3d 727, 728 (7th Cir.1994)(It was reversible error for district court to deny defendant's motion for summary judgment and to allow *pro se* litigant to produce additional evidence: "Summary judgment is not a discretionary remedy. If the plaintiff lacks enough evidence, summary judgment must be granted.").

█ Just as Ms. Vandeveer has failed to show that she is entitled to the protections of the ADA under 42 U.S.C. §§ 12102(2)(A)(impairment at time of employment action) or (B)(record of impairment), so she fails to establish a right to protection under 42 U.S.C. § 12102(2)(C)(regarded as impaired). To

---

**25.** Example 2 states: "CP was recently hospitalized for appendicitis. She underwent a routine appendectomy, was hospitalized for one week, and recovered fully within the normal healing period. Although CP has a hospital record of treatment for appendicitis, she does not have a record of disability. The appendicitis restricted CP's activities for only a brief period and had no long-term or permanent effects on CP. The impairment, therefore, did not substantially limit any of CP's major life activities. As a result, CP does not have a history of a disability and the hospital record does not constitute a record of disability."

prevail on a Section 12102(2)(C) claim, a plaintiff must show that her employer (wrongly) believed her to be unable to work in a particular class or broad range of jobs as required in the definition of disability under Section 12102(2)(A). *See* EEOC Compliance Manual § 902.8 ¶ 6888; *Davidson,* 133 F.3d at 511. In support of her position that Fort James regarded her as disabled, however, Ms. Vandeveer simply notes that several employees at Fort James knew that she had MS. This assertion is non-responsive to the elements with regard to which she has to show a disputed issue of fact. In fact, Ms. Vandeveer has forwarded no evidence at all that anyone at Fort James considered her limited in the ability to work in a broad range of jobs (though it does appear some, for reasons unrelated to MS, felt she was not particularly well-equipped to do her actual job). She may not seek the protections of the ADA on the ground that she was perceived as disabled.

As Ms. Vandeveer has failed to raise disputed issues of material fact suggesting she can meet any of the gateway definitions of "qualified individual with a disability," the court must find that the ADA does not apply to her and that Fort James is entitled to judgment as a matter of law. While the court could (and perhaps should) end the discussion here, it will proceed to demonstrate that even had Ms. Vandeveer successfully invoked the protections of the ADA, summary judgment in favor of Fort James still would be required.

■ As discussed earlier, the ADA does not require employers to accommodate disabled employees who do not request reasonable accommodations for their disability-related workplace limitations. Fort James asserts that Ms. Vandeveer never requested any accommodations for her MS and that, if she did, the requested accommodations were unreasonable as a matter of law. Ms. Vandeveer has failed to direct the court to record evidence rebutting these assertions. It is clear, then, that Fort James is entitled to summary judgment not only due to what might be seen as simple pleading errors or oversights in Ms. Vandeveer's affidavits: Fort James is entitled to summary judgment because the facts do not support her claim.

The ADA was created to address the common prejudicial attitude that disabled employees are limited in their ability adequately to perform jobs in the national economy and to provide disabled individuals with the same employment opportunities available to the non-disabled. *See* 42 U.S.C. § 12101(a). To comply with the law, employers are required to assume disabled individuals are capable of performing their jobs but if a disabled employee indicates she does, in fact, have a specific workplace limitation, they are to provide the employee with an accommodation for that limitation. *See Taylor v. The Principal Fin. Group, Inc.,* 93 F.3d 155, 164 (5th Cir.1996). This is an important point: accommodations are only to be provided when requested; if an employer treats an allegedly disabled individual differently from her peers prior to receiving such a request, it may actually subject itself to liability under the law.

Ms. Vandeveer does not allege that she told Ms. Peters (or anyone else at Fort James) that her MS had advanced to such a stage that she could no longer perform the essential functions of her position without accommodation, that she identified any specific workplace limitations that she might have, or that she requested any specific accommodations for her MS. Instead, she asserts that she informed several employees of Fort James that she had MS and that during a five minute telephone call she told Ms. Peters that stress had exacerbated her condition in the past and that "We have to find a way to stop

the stress that you're causing me." [26] (Vandeveer Dep. at 52). If an employee with an impairment has successfully performed her job in the past, however, it is incumbent upon the employee to inform her employer that her condition has advanced to such a degree that she can no longer perform her duties without specific accommodation(s). *See Jankowski Lee & Assoc.,* 91 F.3d 891, 898 (7th Cir.1996)(Manion, J., dissenting)(citing *Langon v. Dept. of Health and Human Serv.,* 959 F.2d 1053, 1059 (D.C.Cir.1992)). As Ms. Vandeveer failed to do so, she failed to put Fort James on notice that it needed to engage in an interactive process to determine if accommodations might exist that would permit her to perform the essential functions of her position.

The situation before the court is very similar to those in the cases *Hunt–Golliday v. Metro. Water Reclamation Dist. of Greater Chicago* and *Taylor v. Principal Fin. Group, Inc.* In *Hunt–Golliday,* an employee with a mental condition that caused her to become panicked and lightheaded in stressful situations and who toiled under a supervisor who was unreasonable and vindictive toward her requested a "non-hostile" working environment at a hearing concerning a suspension imposed on her for an unexcused absence from work. She did not request a change of shifts or modification of facilities or any other possible accommodation of her mental state, however. On those facts, the Seventh Circuit affirmed a grant of summary judgment, finding that the employee had not placed the employer on sufficient notice that it needed to consider her mental illness a disability (despite the fact she had missed 21 weeks of work due to it) or

that it needed to enter into an interactive process to find an accommodation for her alleged disability. *See* 104 F.3d at 1013. The only difference between *Hunt–Golliday* and the present case is that the plaintiff in *Hunt–Golliday* does not appear to have mentioned her mental illness at the time she requested a less hostile working environment (though the employer was well aware of the illness). Thus, Ms. Vandeveer's case might be considered slightly stronger than that in *Hunt–Golliday.*

Her case is weaker than that in *Taylor,* however. In that case an employee with bipolar disorder told his employer that he had a mental impairment, told his employer that the impairment was interfering with his ability to meet his hiring targets, asked for a reduction in those targets, and requested a "lessening of the pressure" at work. *See* 93 F.3d at 159. He nonetheless stated that he thought he could do his job successfully. *See id.* at 160. The Fifth Circuit ruled that on those facts no reasonable jury could find that the employee had adequately requested an accommodation for his impairment because he failed to inform the employer *how* his impairment was interfering with his ability to meet his hiring objectives and because he had muddled whatever message he intended to impart by stating he could still do his job. *See id.* at 163–64. The same is true here. Ms. Vandeveer never told Ms. Peters how her MS might be affecting her work performance and, instead, told Ms. Peters many times over that she thought she could do-and was doing-her job as well as anyone in the department. Further she, unlike the plaintiff in *Taylor* who asked for reduced hiring targets, never forwarded any specific recommendation(s) for how to accommodate her condition.[27] No reason-

---

**26.** Ms. Vandeveer also asserts that on January 6, 1999, she told Ms. Szamocki that she feared that the stress of working with Ms. Peters might be making her sick. She specifically declined an offer to do something about the situation, however, and, as such, that con-

versation indisputably was not a request for accommodation.

**27.** Ms. Vandeveer argues that under *Bultemeyer v. Fort Wayne Cmty. Sch.* plaintiffs in this

able jury could find that Ms. Vandeveer's alleged five minute telephone call to Ms. Peters put Fort James on notice that it was required to initiate an interactive process to identify reasonable accommodations that would permit her to meet the essential functions of her job.

■ Even if the court were to interpret the record more liberally than legally permissible and to find that a disputed issue of fact exists as to whether Ms. Vandeveer requested a reasonable accommodation for her disability, summary judgment still would be required because she has not identified any reasonable accommodations that might have existed for her MS-related workplace limitations.

Asking an employer to reduce the "stress" of the workplace is an ambiguous, perhaps unattainable goal, and is not a reasonable accommodation. In *Gaul v. Lucent Technologies, Inc.*, 134 F.3d 576 (3rd Cir.1998), the Third Circuit Court of Appeals explained why this is so:

First, [plaintiff's] proposed accommodation would impose a wholly impractical obligation on [defendant] or any other employer. Indeed, [defendant] could never achieve more than temporary compliance because compliance would depend entirely on [plaintiff's] stress level at any given moment. This, in turn, would depend on an infinite number of variables, few of which [defendant] controls. Moreover, the term

"prolonged and inordinate stress" is not only subject to constant change, it is also subject to tremendous abuse. The only certainty for [defendant] would be its obligation to transfer [plaintiff] to another department whenever he becomes "stressed out" by a coworker or supervisor. It is difficult to imagine a more amorphous "standard" to impose on an employer.

Second, [plaintiff's] proposed accommodation would also impose extraordinary administrative burdens on [defendant]. In order to reduce [plaintiff's] exposure to coworkers who cause him prolonged and inordinate stress, [defendant] would have to consider, among other things, [plaintiff's] stress level whenever assigning projects to workers or teams, changing work locations, or planning social events. Such considerations would require far too much oversight and are simply not required under law.

*Id.* at 581. *Accord Gonzagowski v. Widnall,* 115 F.3d 744, 747–48 (10th Cir. 1997)("While specific stressors in a work environment may in some cases be legitimate targets of accommodation, it is unreasonable to require an employer to create a work environment free of stress and criticism.")(citing *Pesterfield v. Tennessee Valley Auth.*, 941 F.2d 437, 442 (6th Cir. 1991)).

Ms. Vandeveer seems to recognize that reducing the stress in her employment

judicial circuit are not required to forward their own recommended accommodations. They only need put the employer on notice that they have an impairment and that they do not believe they can perform their jobs as presently constituted. *Cf.* 100 F.3d at 1286 ("to determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the qualified individual with a disability in need of accommodation")(citing 29 C.F.R. § 1630.2(*o*)(3)(2002)). In that case, the Seventh Circuit found that a mentally

disabled man's request for a less "stressful" position sufficed to put the employer on notice of the need to engage in the interactive process. There, however, the employee did inform the employer that he did not think he could do the job assigned to him and did request a different position. *See id.* at 1282. Ms. Vandeveer never told Fort James that she could not perform her job as then-constituted and never requested a change in her responsibilities. *Bultemeyer* provides no basis for Ms. Vandeveer's lawsuit. *Cf. Hunt–Golliday*, 104 F.3d at 1013 (distinguishing *Bultemeyer* ).

(the only thing she specifically requested that Ms. Peters do) is not in itself a reasonable accommodation. She suggests that a reasonable accommodation would have been for Ms. Peters to stop criticizing her work (apparently the chief source of Ms. Vandeveer's stress) or for Ms. Peters to provide her additional training so she would not commit so many mistakes. (*See* Pl.'s Br. in Opp'n to Summ J. at 7.)

As these suggested accommodations have little, if anything, to do with workplace limitations Ms. Vandeveer may have experienced as a result of her MS, it is doubtful they are the kind of accommodations contemplated by the ADA. Even if they are, however, Ms. Vandeveer has not carried her burden of showing they would be reasonable. *See Vande Zande v. State of Wisconsin,* 44 F.3d 538, 543 (7th Cir.1995)(plaintiff must show that the potential accommodation was reasonable).

It is important to note that Ms. Vandeveer has not denied that numerous mistakes were attributed to her by her team members, including Ms. Siebold.[28] Indeed, she admits that she committed several of them (such as those made in the presence of Ms. Meisner). The proposition that a supervisor should refrain from criticizing an employee's mistakes (or even perceived mistakes) simply because the employee suffers a medical condition strikes the court as incredible. Ms. Vandeveer has not cited any cases suggesting that to do so would be a reasonable accommodation and, in fact, the law is to the contrary. *See Gonzagowski,* 115 F.3d at 747–48 ("it is unreasonable to require an employer to create a work environment free of stress and criticism").

What Ms. Vandeveer seems to be arguing is that her mistakes were not large enough to merit criticism and that this might distinguish her case from those that have found elimination of criticism not to be a reasonable accommodation. The court is unconvinced of this proposition. Ms. Vandeveer seeks to substitute her judgment of what mistakes are "important" for that of her supervisors. Nothing in the ADA permits this sort of usurpation of power. *Cf. Weiler,* 101 F.3d at 526 ("In essence, [plaintiff] asks us to allow her to establish the conditions of her employment .... Nothing in the ADA allows this shift in responsibility.")

Ms. Vandeveer's next proposed stress reliever is much more reasonable, but is something Fort James did, in fact, provide. Ms. Vandeveer was provided the exact same COSMOS training as her co-workers in mid-December 1998. When it appeared that Ms. Vandeveer was having trouble with the program, Ms. Peters had a computer trainer sit with Ms. Vandeveer personally on January 11–12, 1999. Ms. Vandeveer left the company three weeks later. It is hard to imagine what more Fort James should have done. Perhaps more training would have been appropriate if Ms. Vandeveer continued to have problems in the future, but no reasonable jury could conclude that Fort James should have provided her with even more training between January 12 and February 2. Even if a jury could reach that conclusion, Ms. Vandeveer has not established how more extensive training would have accommodated her MS. As such, this is not an accommodation contemplated by the ADA. *Cf. Gonzagowski,* 115 F.3d at 748 (plaintiff "does not establish how more extensive [computer] training would have accommodated his [impairment]"). Ms. Vandeveer's failure to identify potential reasonable accommodations for her MS-related workplace limitations, among other

---

**28.** Suggesting that Fort James cannot prove it was her that made the mistakes is not the same thing as denying that they were attributed to her.

things, compels the entry of summary judgment in favor of Fort James.

## CONCLUSION

Throughout this lawsuit Ms. Vandeveer has sought to rely upon the court's duty to provide justice rather than upon her own proper citations to the law. As Ms. Vandeveer is a *pro se* litigant, the court has accommodated her as far as possible. While the court certainly sympathizes with her-her situation is nothing less than tragic-in the end it is nonetheless bound to apply the law as enacted by Congress and interpreted by the courts. Because Ms. Vandeveer has failed to present record evidence that would support a finding that she was a qualified individual with a disability protected by the ADA, that she requested an accommodation for her impairment, or that a reasonable accommodation existed for her condition, Fort James is entitled to summary judgment. As the Seventh Circuit Court of Appeals has explained, "[s]ummary judgment is not a discretionary remedy. If the plaintiff lacks enough evidence, judgment must be granted." *Jones*, 26 F.3d at 728 (citing *Anderson*, 477 U.S. at 249–51, 106 S.Ct. 2505).

Accordingly,

**IT IS ORDERED** that Fort James's motion to strike be and the same is **GRANTED IN PART** and **DENIED IN PART**;

**IT IS FURTHER ORDERED** that Ms. Vandeveer's motion to strike be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Ms. Vandeveer's motion for summary judgment be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Fort James's motion for summary judgment be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that this case be and the same is hereby **DIS-** MISSED on the merits, together with costs as taxed by the Clerk of Court.

The Clerk of Court is directed to enter judgment accordingly.