JOURNAL ENTRY AND OPINION
{¶ 1} Defendants-appellants/cross-appellees, United Parcel Service, Inc., Kristy Littlefield, Joseph Perillo and James Grant, appeal the judgment of the Cuyahoga County Common Pleas Court, entered on a jury verdict, awarding compensatory damages for disability discrimination in violation of R.C. Chapter 4112. Plaintiff-appellee/cross-appellant, Michael J. Maracz ("Maracz") appeals the denial of his claim for punitive damages.
 {¶ 2} The record reveals that Maracz began his employment with United Parcel Service, Inc. ("UPS") in 1969. By 1977, he was part of UPS management, eventually spending a major portion of his career in the security department, primarily in the area of loss prevention. From 1996 through 1999, Maracz worked as a security supervisor responsible for investigating claims and conducting various other investigations pertinent to the loss of packages entrusted to UPS for delivery.
 {¶ 3} In August 1998, defendant-appellant Kristy Littlefield ("Littlefield") became the District Security Manager and, therefore, one of Maracz's supervisors. Littlefield testified that she knew by the fall of 1999 that she was not satisfied with Maracz's performance in the security department, especially with issues concerning confidentiality. At a managers' meeting in January 2000, Littlefield informed the other managers that Maracz was available for transfer, stating that Maracz "needed a more structured environment." Operations had an opening at the Highland Heights facility in the preload area and, at a meeting on January 28, 2000, Littlefield informed Maracz that he was being reassigned as a preload supervisor at the Highland preload operation. It is undisputed that Maracz voiced no objection about this reassignment other than to complain about the commute.
 {¶ 4} As a preload supervisor, Maracz was responsible for supervising the process necessary to prepare packages for delivery by the UPS drivers. The department was comprised of four preload supervisors under the direct authority of preload manager, Dario Skocir ("Skocir"), who in turn reported to hub and air manager, Joseph Perillo ("Perillo"), one of the defendants in this case. Each supervisor, with the help of one or two part-time preload supervisors, was responsible for supervising different conveyor belts, which are used when UPS hourly employees unload packages from trailers and sort them for delivery according to geographical area. Once sorted, UPS drivers deliver the packages for which they are responsible.
 {¶ 5} Maracz was initially responsible for Belts 4 and 5, as well as early morning deliveries, referred to at UPS as "EAMs." EAMs were processed differently, in that "air drivers" retrieve these packages at the airport and, instead of returning to the Highland preload operation, arrangements are made by the preload supervisor for the air drivers to meet a UPS delivery driver at different "meet points" so that the packages can be delivered.
 {¶ 6} Perillo and Skocir both testified that Maracz was not performing as expected in his new position. On February 29, 2000, approximately four weeks after he began working in the preload operation, Maracz informed Perillo that he had "bad feet." Maracz testified that he injured his left foot in an automobile accident as a teenager in 1967 and underwent two surgeries to repair the injury before joining UPS. He complained that he was having difficulty performing the responsibilities associated with being a preload supervisor because of his physical limitations. In particular, Maracz complained that he was unable to walk and stand as much as the job required because of his preexisting foot injury. Around this same time, Perillo informed Maracz that, based on his performance, he could not recommend him to participate in the Manager's Incentive Plan ("MIP"), which is a performance-based incentive program that results in significant pecuniary benefits for the eligible employee.[1]
 {¶ 7} On March 7, 2000, podiatrist Frederick Schmeider, DPM, examined Maracz and diagnosed him with degenerative joint disease in his left ankle. Dr. Schmeider completed a Return to Work Status report for Maracz, wherein he stated the Maracz would be unable to work from March 7, 2000 until April 16, 2000. Dr. Schmeider later modified that status, stating that Maracz could return to work on April 3, 2000, but was limited to a "sitting job with minimal standing/walking" until an estimated date of May 21, 2000.[2] Maracz went on short-term disability during this time period.
 {¶ 8} In contemplation of these restrictions, Perillo informed Maracz that he would no longer be responsible for Belts 4 and 5, which required regular walking, but that he would continue to be responsible for EAMs, which required little or no walking or standing. Moreover, Maracz's workday was changed from Monday through Friday to Tuesday through Saturday. Maracz was additionally assigned to supervise Saturday air deliveries beginning April 22, 2000. Skocir testified that Saturdays are a light delivery day, with substantially fewer packages being delivered, and Maracz would have the assistance of a part-time supervisor and use of a motorized cart so as to minimize the time on his feet during the 45-minute sort.
 {¶ 9} Maracz returned to work on April 4, 2000[3] in a "residual disability" capacity, which is the classification used for employees on short-term disability who are unable to fully return to their previous job responsibilities. For the first two weeks after his return, Maracz primarily answered phones and performed other duties with little walking or standing. As of April 17, 2000, however, Maracz became responsible for the duties as outlined by Perillo, which was primarily the EAMs and Saturday air deliveries. Maracz testified that, although he attempted to perform these duties as modified, he could not completely do so without experiencing pain.
 {¶ 10} Maracz consulted with his orthopedic physician, Dr. Kuschnir, on April 17, 2000, who diagnosed him as suffering from Morton's Neuroma. According to Dr. Kuschnir's testimony, Morton's Neuroma is an irritation of the nerves of the feet and is correctable by surgery. He prescribed pain medication and recommended periodic monitoring.[4] Maracz also returned to Dr. Schmeider for follow-up shortly after seeing Dr. Kuschnir. Dr. Schmeider restricted Maracz to "minimal standing/walking (as tolerated)" for an indefinite time period beginning May 4, 2000 and thereafter noted that these restrictions were permanent. Contemporaneous with these restrictions, Dr. Dreher, Maracz's family physician, entered restrictions that Maracz could not (1) stand on his feet for more than two hours a day; (2) engage in repetitive climbing more than 10 times a day; and (3) walk for more than two hours a day. Both Skocir and Perillo testified that, in their opinion, the modifications in job responsibilities made by them complied with these restrictions.
 {¶ 11} After informing Perillo and Skocir of his continued pain and physical limitations, Maracz requested accommodation. According to Maracz's testimony, he expressly asked to be reassigned to his previous security supervisor position, which was still vacant, or any other vacant position where he would not have to be on his feet as much. As part of this request, UPS scheduled a Functional Capacity Examination for June 8, 2000. Maracz completed the evaluation and, in a report completed on June 16, 2000 by clinician Kevin Callahan, Maracz was found to be capable of medium duty work on an eight-hour day basis. In particular, the report noted his tolerances "were frequent for walking (2-3 hrs./day), standing (2-3 hrs./day), bending, scooping, overhead reaching, pivot twisting, push/pulling, sorting, and stacking." He exhibited "occasional tolerances" for "stair/ladder climbing, crouching, repetitive squatting, crawling, and kneeling."
 {¶ 12} On June 30, 2000, UPS forwarded this report to Dr. Kuschnir and asked him to opine as to whether he agreed with results of this evaluation and whether Maracz's restrictions would be permanent. On July 14, 2000, Dr. Kuschnir responded, but only noted that Maracz's restrictions were permanent. He did not offer an opinion as to whether he agreed or disagreed with the results of the Functional Capacity Examination.
 {¶ 13} In determining whether Maracz could receive an accommodation, UPS forwarded a Request for Medical Information to Dr. Kuschnir on August 8, 2000. The request form is two pages in length and asks several questions pertinent to the employee's medical condition and ability to perform essential job functions. Attached to the form was a description of the essential job functions for a preload supervisor. Dr. Kuschnir detailed several job functions that he considered Maracz to be incapable of performing and the underlying medical conditions responsible. He, nonetheless stated that Maracz's condition is controllable with medication or corrective devices, which would enable him to perform the functions of preload supervisor. Dr. Kuschnir completed this form on August 14, 2000 and forwarded it to UPS as directed.
 {¶ 14} Based on Dr. Kuschnir's report and the results of the Functional Capacity Examination, UPS denied Maracz's request for an accommodation on October 3, 2000. Maracz did not return to work as a preload supervisor after that date and, instead, remained on short-term disability. On February 7, 2001, UPS corresponded with Maracz based on a reported change in condition. Defendant-appellant James Grant ("Grant"), the Human Relations Manager for the Highland facility, testified that he learned from Maracz's legal counsel that the change in condition was that Maracz could no longer work at all. Because of this change in condition, UPS again asked Maracz to have his physician complete a second Request for Medical Information. Dr. Kuschnir, on March 7, 2001, revised the Request for Medical Information completed by him on August 14, 2000 by stating that Maracz's condition isnot controllable with medication or corrective devices and, therefore, Maracz was unable to perform the functions of a preload supervisor. Dr. Kuschnir testified that he incorrectly completed the August 14, 2000 request form. Nonetheless, UPS administratively terminated Maracz on March 31, 2001, which, according to UPS policy is required when an employee in on short-term disability for 12 months. Maracz thereafter was eligible for, and began receiving, long-term disability.
 {¶ 15} In March 2001, Maracz brought a six-count complaint against UPS, Littlefield, Perillo and Grant (collectively referred to as "UPS" where appropriate), which contained allegations of (1) intentional tort; (2) sex discrimination, in violation of R.C. Chapter 4112; (3) disability discrimination, in violation of R.C. Chapter 4112; (4) retaliation in violation of public policy; (5) breach of contract/promissory estoppel; and (6) intentional infliction of emotional distress. He sought compensatory and punitive damages. The case proceeded to trial in May 2002, after being assigned to a visiting judge. The trial judge directed a verdict on Maracz's claims for sex discrimination, breach of contract/promissory estoppel, intentional infliction of emotional distress and punitive damages. A mistrial was declared, however, on the remaining claims because the jury could not reach a verdict.
 {¶ 16} Trial on the remaining claims — intentional tort, disability discrimination and retaliation in violation of public policy — began anew in May 2003, before a different visiting judge. The trial court denied UPS's motions for directed verdict. The jury ultimately returned a verdict in favor of Maracz on his claims for intentional tort and disability discrimination, awarding $300,000 and $1,547,839, respectively. The jury found in favor of UPS on Maracz's claims for retaliation.
 {¶ 17} UPS is now before this court and assigns five errors for our review. Maracz also seeks review, on cross-appeal, of the denial of his claim for punitive damages.
 I. {¶ 18} In its first and fourth assignments of error, UPS contends that the trial court erred in denying its motion for judgment notwithstanding the verdict on Maracz's claims for intentional tort and disability discrimination.
 {¶ 19} When ruling on a motion for judgment notwithstanding the verdict, a trial court employs the same test applicable to a motion for directed verdict. That is, the evidence as adduced at trial and as borne by the record must be construed most strongly in favor of the party against whom the motion is made. Where there is substantial evidence to support the non-movant's side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied. Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination when ruling upon either of the above motions.Posin v. ABC Motor Court Hotel, Inc. (1976), 45 Ohio St.2d 271,275; see, also, Texler v. D.O. Summers Cleaners Shirt Laundry
(1998), 81 Ohio St.3d 677, 679. Appellate review of a motion for judgment notwithstanding the verdict is de novo. Schafer v. RMSRealty (2000), 138 Ohio App.3d 244, 257-258.
 A. Intentional Tort {¶ 20} An intentional tort is "an act committed with the intent to injure another, or committed with the belief that such injury is substantially certain to occur." Hannah v. DaytonPower Light Co. (1998), 82 Ohio St.3d 482, 484. The Ohio Supreme Court in Fyffe v. Jeno's, Inc. (1991),59 Ohio St.3d 115, set forth the following test in determining whether an employer committed an intentional tort against an employee:
 {¶ 21} "In order to establish `intent' for the purpose of proving the existence of an intentional tort committed by an employer against his employee, the following must be demonstrated: (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality or condition, then harm to the employee will be a substantial certainty; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task." Id. at paragraph one of the syllabus. "[P]roof beyond that required to prove negligence and beyond that to prove recklessness must be established. Where the employer acts despite his knowledge of some risk, that conduct may be negligence. As the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness. As the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result. However, the mere knowledge and appreciation of a risk — something short of substantial certainty — is not intent." Id. at paragraph two of the syllabus.
 {¶ 22} Applying this standard in the context of medical restrictions, an employer has been held to have acted with actual knowledge under Fyffe if that employer requires the employee to perform job duties outside the scope of his or her medical restrictions. See Bee v. Toth Industries, Inc.,150 Ohio App.3d 184, 2002-Ohio-6240, at ¶ 26-27; Sinea v. Denman Tire Corp.
(1999), 135 Ohio App.3d 44, 58; see, also, Raines v. Rubbermaid,Inc. (1996), 112 Ohio App.3d 384. UPS argues that there was no evidence indicating that it required Maracz to work outside his medical restrictions. We agree.
 {¶ 23} When UPS reassigned Maracz to the preload operation, no medical restrictions were in place. It was not until March 7, 2000 that Dr. Schmeider first imposed medical restrictions. When Maracz returned to work, he was restricted to a "sitting job with minimal standing/walking." Those restrictions were expanded shortly thereafter to "minimal standing/walking (as tolerated)" and no more than two hours each for standing and walking. Perillo and Skocir testified that they modified Maracz's job responsibilities in compliance with these restrictions. From April 17, 2000 until October 3, 2000, Maracz's job responsibilities were limited to EAMs and Saturday air deliveries, which both involved little or no walking. Skocir and Perillo both testified that they believed these job responsibilities were within Maracz's medical restrictions.
 {¶ 24} It is true that Skocir testified that he occasionally asked Maracz to do additional duties, if he could tolerate them. The restrictions imposed by Dr. Schmeider specifically state that Maracz's minimal standing/walking restriction is as tolerated.
Dr. Dreher's restrictions, issued contemporaneously with Dr. Schmeider's, provided more specificity and limited Maracz to two hours each for standing and walking. Skocir testified when he asked Maracz to perform an additional task, he would ask if he "was okay with this," believing that the task was one that could be performed within his restrictions. Indeed, Maracz testified that none of his supervisors asked him to work outside his restrictions. In fact, Maracz recorded several telephone conversations between him and several of his supervisors during this time period, all without the knowledge of the respective supervisor. In several conversations, Maracz was instructed to work within his restrictions. Indeed, Grant stated in one such conversation that Maracz was not to go back to work if he was unable to work within his restrictions. In another conversation with Employee Relations Manager, Steven Huyghe, Maracz was reminded to work within his restrictions.
 {¶ 25} Maracz, however, testified that his supervisors should have known by watching him that he was in pain and unable to complete even the modified tasks given him. Such evidence does not rise to the level of "actual knowledge" necessary to find UPS's conduct intentional as defined by Fyffe.[5]
 {¶ 26} Without any evidence indicating that UPS required Maracz to work outside his medical restrictions, Maracz's claim for intentional tort must fail. Because reasonable minds could not reach different conclusions on this issue, it was error for the trial court to deny UPS's motion for judgment notwithstanding the verdict on Maracz's claim for intentional tort.[6]
 Disability Discrimination {¶ 27} R.C. 4112.02 addresses unlawful discriminatory practices and provides that it "shall be an unlawful discriminatory practice * * * [f]or any employer, because of the * * * disability * * * of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." R.C. 4112.02(A).
 {¶ 28} To establish a prima facie case of disability discrimination under R.C. Chapter 4112,[7] an employee must demonstrate: (1) that he or she was disabled; (2) that the employer took an adverse employment action against the employee, at least in part, because the employee was disabled; and (3) that the employee could safely and substantially perform the essential functions of the job in question despite his or her disability.Hood v. Diamond Prod., Inc. (1996), 74 Ohio St.3d 298. An employee may satisfy the third element of the prima facie case by showing that he could have performed the essential functions of the job with a reasonable accommodation, if necessary. Shaver v.Wolske Blue (2000), 138 Ohio App.3d 653, 663. Once an employee establishes a prima facie case of disability discrimination, "the burden then shifts to the employer to set forth some legitimate, nondiscriminatory reason for the action taken." Hood,74 Ohio St.3d at 302. If the employer does so, "then the employee * * * must demonstrate that the employer's stated reason was a pretext for impermissible discrimination." Id.
 {¶ 29} "Disability" is defined as a "physical or mental impairment that substantially limits one or more major life activities, including the functions of * * * walking * * * and working * * *." See R.C. 4112.01(A)(13). The determination of whether an impairment substantially limits an individual's major life activities is an individualized inquiry. Toyota Motor Mfg.,Ky., Inc. v. Williams (2002), 534 U.S. 184, 198-199,122 S.Ct. 681, 151 L.Ed.2d 615. No impairment constitutes a disability per se; rather, an impairment is a disability if it limits the major life activities of the particular individual who is impaired.Sutton v. United Air Lines, Inc. (1999), 527 U.S. 471, 483,119 S.Ct. 2139, 133 L.Ed.2d 450. Major life activities are those activities that are of "central importance to daily life."Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. at 197,122 S.Ct. 681, 151 L.Ed.2d 615. A physical impairment, standing alone, does not necessarily constitute a disability. Kirkendallv. United Parcel Service, Inc. (W.D.N.Y. 1997), 964 F.Supp. 106,109. To qualify as a disability, an impairment must "limit an individual, not in a trivial or even moderate manner, but in a major way." Gonzales v. Natl. Bd. of Med. Examiners (C.A.6, 2000), 225 F.3d 620, 627. Indeed, a physical impairment "may affect an individual's life without becoming disabling." Id., citing Hazeldine v. Beverage Media, Ltd. (S.D.N.Y. 1997),954 F.Supp. 697. An "impairment that only moderately or intermittently prevents an individual from performing major life activities is not a substantial limitation * * *." Mahon v.Crowell (C.A.6, 2002), 295 F.3d 585, 590-591, citing ToyotaMotor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 122 S.Ct. 681,151 L.Ed.2d 615. Moreover, it is insufficient for an individual to merely submit evidence of a medical diagnosis of an impairment when attempting to prove disability status. Toyota Motor Mfg.,Ky., Inc. v. Williams, 534 U.S. 184, 198, 122 S.Ct. 681,151 L.Ed.2d 615.
 {¶ 30} Maracz maintains that the jury correctly found that he was disabled because he is substantially limited in walking and working, both major life activities under the statute. As pertains to walking, Dr. Dreher stated that Maracz could walk up to two hours a day, while Dr. Kuschnir limited Maracz's walking to 20 minutes at a time, four times a day. Maracz testified that he can be on his feet from twenty minutes to two hours. According to the Functional Capacity Exam, Maracz could tolerate walking two to three hours a day.
 {¶ 31} Section 1630.2(j)(1), Title 29, C.F.R., provides that an individual is "substantially limited" if that individual is:
 {¶ 32} "i) Unable to perform a major life activity that the average person in the general population can perform; or
 {¶ 33} "ii) Significantly restricted as to the condition, manner or duration under which [the] individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity." In determining whether an individual is substantially limited in a major life activity, the following factors are to be considered:
 {¶ 34} "(i) The nature and severity of the impairment;
 {¶ 35} "(ii) The duration or expected duration of the impairment; and
 {¶ 36} "(iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." Section 1630.2(j)(2).
 {¶ 37} Mere difficulty in standing or walking is not sufficient to establish a substantial limitation on the major life activity of walking. Brown v. BKW Drywall Supply, Inc.
(S.D.Ohio 2004), 305 F.Supp.2d 814, 825. Even moderate difficulty in walking may not establish a substantial impairment. SeeSatterly v. Borden Chem., Inc. (C.A.6, 2001), 24 Fed. Appx. 471, 472 (finding that, although plaintiff had difficulty walking and may walk at a slower pace than others, he had failed to establish substantial impairment); Talk v. Delta Airlines, Inc.
(C.A.5, 1999), 165 F.3d 1021, 1025 (finding that plaintiff walked with a limp and at a slower pace than the average person due to a leg deformity did not rise to the level of a substantial impairment); Penny v. United Parcel Serv. (C.A.6, 1997),128 F.3d 408, 415 (finding that "moderate difficulty or pain experienced while walking does not rise to the level of a disability" under the ADA); Penchishen v. Stroh Brewery Co.
(E.D.Pa. 1996), 932 F.Supp. 671, affirmed without opinion (C.A.3, 1997), 116 F.3d 469 (finding that a plaintiff with a metal plate in her left ankle, inserted after sustaining injury in an automobile accident, who could walk her normal gait or pace and must place both feet on each step before moving to the next step, was not substantially limited in the major life activity of walking); Kelly v. Drexel Univ. (C.A.3, 1996), 94 F.3d 102,106-108 (finding no substantial limitation in ability to walk where plaintiff suffering from severe post-traumatic degenerative joint disease of the right hip stated that he could not walk more than a mile, could not jog, and had to pace himself slowly when climbing stairs); Nedder v. Rivier College (D.N.H. 1996),944 F.Supp. 111, 117 (finding at most moderate impairment where plaintiff could walk, albeit with considerable exertion and more slowly than the average person due to her obesity).
 {¶ 38} Moreover, courts have found no substantial limitation even when an individual is limited to standing or walking for only 15 or 20 minutes at a time. See Vandeveer v. Fort JamesCorp. (E.D.Wis. 2002), 192 F.Supp.2d 918; Lucarelli v. Consol.Rail Corp. (Mar. 27, 2002), E.D.Pa. No. 98-CV-5904, 2002 U.S. Dist. Lexis 12201; see, also, Black v. Roadway Express, Inc.
(C.A.6, 2002), 297 F.3d 445 (inability to walk or stand for a prolonged time is not a substantial limitation).
 {¶ 39} Based on this case law, we can only conclude that Maracz's evidence of impairment in walking does not rise to the level of a "substantial limitation." It is true that sufficient evidence was presented indicating that Maracz suffers an impairment that affects, to some degree, his ability to walk. However, the evidence was insufficient to conclude that the nature and severity of his impairment substantially limited his ability to walk as compared with an average person in the general population. As can be surmised from the decisional law cited above, an individual is considered substantially limited in the major life activity of walking when the individual's ability to walk is so restricted that it substantially affects all areas of his or her life. Merely being limited to some degree, even a moderate degree, is insufficient.
 {¶ 40} The United States Supreme Court in Williams opined that the legislature exacted a "demanding standard for qualifying as disabled." 534 U.S. at 197, 122 S.Ct. 681, 151 L.Ed.2d 615. When Congress enacted the ADA in 1990, it found that "`some 43,000,000 Americans have one or more physical or mental disabilities.'" Id. Using examples of the major life activity of manual tasks, the Williams court stated that "[i]f Congress intended everyone with a physical impairment that precluded the performance of some isolated, unimportant, or particularly difficult manual task to qualify as disabled, the number of disabled Americans would surely have been much higher. Id. Similarly, the Williams court quoted Sutton v. United AirLines, Inc., 527 U.S. at 487, 119 S.Ct. 2139, 133 L.Ed.2d 450, wherein the latter, addressing the major life activity of seeing, found that "because more than 100 million people need corrective lenses to see properly, `had Congress intended to include all persons with corrected physical limitations among those covered by the Act, it undoubtedly would have cited a much higher number [than 43 million disabled persons in the findings.'" Id. The same can be said about the major life activity of walking. Had Congress intended everyone who was even moderately impaired in their ability to walk, the number of disabled Americans would have been considerably higher than the 43 million it referenced.
 {¶ 41} Despite the permanency of Maracz's walking restrictions,[8] we find the evidence presented in this case insufficient to support a finding that Maracz was substantially limited in the major life activity of walking when analyzed in the framework of decisional law from the various federal courts interpreting the ADA.
 {¶ 42} Nor does the evidence indicate that Maracz was substantially limited in the major life activity of "working." Assuming without deciding that Maracz presented sufficient evidence that he was unable to perform the job of preload supervisor, even as modified, an individual is not substantially limited in the major life activity of working if he or she is merely unable to perform a single, particular job. See Section 1630.2(j)(3)(i), Title 29, C.F.R.; see, also, McKay v. ToyotaMotor Mfg. (C.A.6, 1997), 110 F.3d 369, 372. On the contrary, the individual is only substantially limited in this major life activity when he or she is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person with comparable training, skills, and abilities." See Section 1630.2(j)(3)(i), Title 29, C.F.R.
 {¶ 43} In determining whether an individual is substantially limited in the major life activity of working, it is appropriate to present evidence of:
 {¶ 44} "(A) [t]he geographical area to which the individual has reasonable access;
 {¶ 45} "(B) [t]he job from which the individual has been disqualified because of impairment, and the number of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or
 {¶ 46} "(C) [t]he job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes.)" Section 1630.2(j)(3)(ii), Title 29, C.F.R.
 {¶ 47} The evidence presented in this case fails to demonstrate that Maracz was disqualified from a class of jobs or a broad range of jobs. Maracz was required to "produce some evidence of the number and types of jobs in the local employment market in order to show he is disqualified from a substantial class or broad range of such jobs; that is, the total number of such jobs that remain available to the plaintiff in such a class or range in the relevant market must be sufficiently low that he is effectively precluded from working in the class or range."Duncan v. Washington Metro. Area Transit Auth. (C.A.D.C. 2001),240 F.3d 1110, 1115-16, citing Sutton, 527 U.S. at 491-92.
 {¶ 48} On the contrary, Maracz's evidence was confined to his inability to perform the particular job of preload supervisor. Indeed, Maracz testified that he "had no disability" for the various jobs he held prior to being assigned as preload supervisor. This testimony underscores a fundamental misunderstanding of the term "disabled" in the context of determining whether an individual is substantially limited in the major life activity of working. It is not the particular job that is the focus, but the class of jobs or the broad range of jobs for which an individual is disqualified because of his or her impairment. Because there was no evidence to indicate that Maracz was precluded from working a class or broad range of jobs, Maracz cannot be considered substantially limited in the major life activity of working and, therefore, disabled under the statute.
 {¶ 49} Even if we were to find the evidence sufficient to classify Maracz as disabled, we find Maracz presented insufficient evidence that he was entitled to an accommodation.
 {¶ 50} The employee bears the burden of proposing an accommodation and showing that it is objectively reasonable. SeeMonette v. Electronic Data Sys. (C.A.6, 1996), 90 F.3d 1173,1183. A reasonable accommodation includes "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position * * *." Section 1630.2(o)(1)(ii), Title 29, C.F.R.
 {¶ 51} Potential reasonable accommodations include "job restructuring, part-time or modified work schedules; reassignment to a vacant position; acquisition or modification of equipment or devices; appropriate adjustment or modifications of examinations, training materials or policies; the provision of qualified readers or interpreters; and other similar accommodations for individuals with disabilities." Section 1630.2(o)(2)(ii), Title 29, C.F.R.
 {¶ 52} Here, Maracz's request for accommodation was limited to requesting reassignment to a vacant position. Although an accommodation of last resort,[9] Maracz was required to put forth evidence that he was a qualified individual with a disability. An individual is qualified if he or she (1) meets the necessary prerequisites for the particular job, such as education, experience, and training; and (2) is able to perform the essential job functions, with or without reasonable accommodation. See Benson v. Northwest Airlines, Inc. (C.A.8, 1995), 62 F.3d 1108, 1111-12; Daugherty v. El Paso (C.A.5, 1995), 56 F.3d 695, 698-99; see, also, Section 1630.2(m), Title 29, C.F.R.
 {¶ 53} In this regard, Maracz testified that he was qualified for a position as plant engineering supervisor. Jake Powell, a plant engineering supervisor at UPS, testified, however, that he spends approximately 50 percent of his time at work in this position on his feet. Indeed, the Essential Job Functions for this position include being able to climb ladders and stairs, as well as walk and stand. More importantly, the position requires a four-year college degree, which Maracz does not possess.
 {¶ 54} Maracz also testified that he was qualified to return to his previous position of security supervisor. Although there was contradictory evidence as to the amount of walking involved in this position, the evidence does not indicate that Maracz is qualified for this position. Mike Novak, the security manager and Maracz's former supervisor, testified that he did want Maracz back in his department because of his deficient performance.
 {¶ 55} Thus, even if there was sufficient evidence indicating that Maracz was disabled, there was insufficient evidence that there was a vacant position for which Maracz was qualified that would serve as a reasonable accommodation under the statute.
 {¶ 56} Without sufficient evidence indicating that Maracz was disabled, he cannot establish a prima facie case of disability discrimination under R.C. Chapter 4112. Because reasonable minds could not reach different conclusions on this issue, it was error for the trial court to deny UPS's motion for judgment notwithstanding the verdict on Maracz's claim for disability discrimination. See Colwell v. Suffolk Cty. Police Dept.
(C.A.2, 1998), 158 F.3d 635; see, also, Rossbach v. Miami
(C.A.11, 2004), 371 F.3d 1354.
 {¶ 57} UPS's first and fourth assignments of error are sustained.
 II. {¶ 58} Because of our disposition of UPS's first and fourth assignments of error, we need not discuss UPS's remaining assignments of error or Maracz's assignment of error on cross-appeal.[10] See App.R. 12(A)(1)(c).
 III. {¶ 59} We conclude that there was insufficient evidence to support the jury's findings that UPS committed an intentional tort against Maracz or that Maracz was disabled within the meaning of R.C. Chapter 4112.
 {¶ 60} Therefore, the judgment of the trial court denying UPS's motion for judgment notwithstanding the verdict on Maracz's claims for intentional tort and disability discrimination is reversed and judgment is entered for UPS on these claims.
It is ordered that appellants/cross-appellees recover from appellee/cross-appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal. It is ordered that a special mandate be sent to the Cuyahoga County Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Cooney, J., concurs, Sweeney, P.J., Concurs in Judgment Only.
[1] As testified to by several witnesses, MIP is traditionally paid in September of any given calendar year. Being advised early in the year that an employee may not be recommended does not necessarily signify that the employee will not ultimately receive MIP. If the employee's performance improves, the employee may, indeed, ultimately participate in the incentive program that coming September, despite being warned earlier that the employee may not be recommended.
[2] Maracz had three different physicians during this time period. In addition to Dr. Schmeider, Maracz was treated by a Dr. Dreher, a primary care physician, and an orthopedic physician, Konstantin Kuschnir, M.D.
[3] April 4, 2000 was a Tuesday, the first day of Maracz's new work week.
[4] Maracz had surgery to correct Morton's Neuroma in April 2001.
[5] If anything, UPS's conduct may be considered negligent or even reckless, but not intentional. See Raines v. Rubbermaid,Inc., 112 Ohio App.3d at 391.
[6] We are troubled by the trial judge's remarks to counsel made after UPS moved for a directed verdict at the close of Maracz's case-in-chief. Specifically, the judge stated that he wanted the jury to decide this case and that "even if [UPS's] motion ha[d] merit" that "[the trial judge] really [didn't] care." He thereafter expressed fear of criticism from Maracz or his counsel if he were to rule otherwise.
The trial judge is charged with enforcing the civil rules during the course of a trial and cannot abdicate his or her duty on the capricious whim that the judge "doesn't care." If the motion had merit, it was the trial judge's duty to grant the motion, or to deny it if it did not.
[7] In analyzing claims brought under R.C. Chapter 4112, it isappropriate to look to federal case law interpreting theAmericans with Disabilities Act ("ADA") for guidance.Fitzmaurice v. Great Lakes Computer Corp., Cuyahoga App. No. 82711, 2004-Ohio-235, at ¶ 3, citing Columbus Civ. Serv. Comm.v. McGlone (1998), 82 Ohio St.3d 569. "Ohio's statute was modeled after the federal Americans with Disabilities Act (`ADA') and therefore, we look to the ADA and its interpretation by federal courts for guidance in interpreting the Ohio statute." Id.
[8] Moreover, Dr. Kuschnir opined, at least initially, that Maracz's impairment was controllable with medication. A person whose physical impairment is corrected by medication does not have an impairment that presently "substantially limits" a major life activity. Sutton v. United Air Lines, Inc., 527 U.S. 471,482-483, 119 S.Ct. 2139, 133 L.Ed.2d 450. Although Dr. Kuschnir revised this opinion in March 2001, at the time it was originally rendered, it served as an additional basis for finding Maracz not disabled under the statute. The fact that Dr. Kuschnir later revised this opinion by stating that Maracz's condition is not controllable with medication does not detract from our conclusion that the evidence is insufficient to find Maracz substantially limited in the major life activity of walking. Indeed, "the use of medication * * * does not, standing alone, relieve one's disability. Rather, one has a disability under the statute if, notwithstanding the use of medication * * *, that individual is substantially limited in a major life activity." See Hewitt v.Alcan Aluminum Corp. (D.N.Y. 2001), 185 F.Supp.2d 183, 188-189, citing Sutton, supra.
[9] Aka v. Washington Hosp. Ctr. (C.A.D.C. 1998),156 F.3d 1284, 1301 ("Congress saw reassignment * * * as an option to be considered only after other efforts at accommodation have failed."); see, also, Cravens v. Blue Cross and Blue Shield ofKansas City (C.A., 8), 214 F.3d 1011, 1019.
[10] The issues raised by these assignments of error include: (1) the appropriateness of jury instruction for intentional tort; (2) the admissibility of the Bureau of Workers Compensation determination; (3) whether UPS was entitled to a new trial or remittitur; and (4) whether Maracz was entitled to punitive damages.